UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

JENNIFER L. WALLS,

      Plaintiff,

v.                        Case No: 2:23-cv-150-JES-KCD

LEE MEMORIAL HEALTH SYSTEM,

      Defendant.

_____

**OPINION AND ORDER**

This matter comes before the Court on the Motion for Summary Judgment (Doc. #46) filed by Defendant Lee Memorial Health System ("Defendant" or "Lee Health") on September 27, 2024. Plaintiff Jennifer L. Walls ("Plaintiff" or "Dr. Walls") filed a Response in Opposition (Doc. #51) on November 25, 2024. Defendant filed a Reply Brief in Support (Doc. #52)[1] on December 9, 2024.

Dr. Walls is a former employee of Lee Health who was employed as a pediatric emergency room physician. Due to serious health issues related to a COVID-19 infection, Dr. Walls was unable to work for over six months. Dr. Walls returned to work for several months, then was again unable to work, this time permanently. Lee Health asserts that Dr. Walls could not perform her job with or without reasonable accommodation, but that she nonetheless

_____

[1] The Court, in the exercise of its discretion, denies the motion to strike embedded in Lee Health's Reply, (Doc. #52, p. 2.)

requested an indefinite leave of absence and a transfer to an unspecified position within Lee Health.  Lee Health denied both requests.  Lee Health asserts that because Dr. Walls could not perform her job or provide a return-to-work date, it properly refused her further accommodation and terminated her.

Dr. Walls filed a four-count Complaint (Doc. #1) against Lee Health.  Count I alleges disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, *et seq.*  (Id. at 4-5.)  Count II alleges disability discrimination in violation of the Florida Civil Rights Act ("FCRA"), Fla Stat. § 760.10.  (Id. at 5-6.)  Count III alleges retaliation in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615.  (Id. at 6-7.)  Count IV alleges workers' compensation interference in violation of Fla. Stat. § 440.105.  (Id. at 7-8.)

Lee Health seeks summary judgment on each of the four counts for various reasons.  Dr. Walls opposes the motion, asserting that the evidence for each count suffices to withstand summary judgment.  For the reasons set forth below, Lee Health's motion for summary judgment is **GRANTED** in full.

## I.

Summary judgment is appropriate only when a movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists when the evidence

is such that a reasonable trier of fact could return a verdict for the non-moving party. McCreight v. AuburnBank, 117 F.4th 1322, 1329 (11th Cir. 2024). A fact is "material" if it may affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A court must decide 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (quoting Anderson, 477 U.S. at 251).

In ruling on a motion for summary judgment, a court views all evidence and draws all reasonable inferences in favor of the non-moving party. Scott v. Harris, 550 U.S. 372, 378 (2007); Tana v. Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010). Even if facts are undisputed, a court should deny summary judgment if reasonable minds might differ on inferences arising from those facts. St. Charles Foods, Inc. v. America's Favorite Chicken Co., 198 F.3d 815, 819 (11th Cir. 1999). "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." Allen v. Bd. of Pub. Educ., 495 F.3d 1306, 1315 (11th Cir. 2007).

While it has not always been so, "the summary judgment rule applies in job discrimination cases just as in other cases."

Chapman v. AI Transp., 229 F.3d 1012, 1026 (11th Cir. 2000)(en banc).

An employee may prove discrimination or retaliation with direct or circumstantial evidence. Desert Palace, Inc. v. Costa, 539 U.S. 90, 99 (2003); Jefferson v. Sewon Am., Inc., 891 F.3d 911, 921 (11th Cir. 2018). An employee opposing summary judgment with circumstantial evidence must present enough to create a triable issue of material fact. Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). A triable issue exists if the evidence, viewed in the light most favorable to the employee, would allow a reasonable jury to infer that the employer has engaged in intentional discrimination or retaliation. Lewis v. City of Union City, 934 F.3d 1169, 1185 (11th Cir. 2019).

Courts assessing such claims generally apply the burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), a useful tool "for assessing claims, typically at summary judgment, when the plaintiff relies on indirect proof of discrimination." Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 589 U.S. 327, 340 (2020).

The McDonnell Douglas framework, however, is not the only means by which an employee can prove discrimination or retaliation with circumstantial evidence. Lee v. Russell Cty. Bd. of Educ., 684 F.2d 769, 773 (11th Cir. 1982); Smith, 644 F.3d at 1328. Without relying on the McDonnell Douglas framework, an employee

may prove their case with any circumstantial evidence that permits a reasonable inference of discrimination or retaliation. <u>Smith</u>, 644 F.3d at 1328; <u>Lewis</u>, 934 F.3d at 1185. While the Eleventh Circuit has referred to this approach as a "convincing-mosaic framework," <u>Berry v. Crestwood Healthcare LP</u>, 84 F.4th 1300, 1311 (11th Cir. 2023), that is simply a "more poetic" way of saying that an employee may present circumstantial evidence in any form that supports such a reasonable inference, <u>McCreight</u>, 117 F.4th at 1335. "The legal standard—and the question for the court at summary judgment—is only whether the evidence permits a reasonable factfinder to find that the employer retaliated [or discriminated] against the employee. That legal standard applies no matter how an employee presents her circumstantial evidence." <u>Berry</u>, 84 F.4th at 1311 "The convincing mosaic approach is—in its entirety—the summary judgment standard." <u>McCreight</u>, 117 F.4th at 1335.

Nonetheless, "inferences in favor of [an employee] can be based only on evidence—not on speculation." <u>Martin v. Fin. Asset Mgmt. Sys., Inc.</u>, 959 F.3d 1048, 1058 (11th Cir. 2020). "Thus, where the nonmoving party presents evidence that is merely colorable or not significantly probative, the movant is entitled to judgment as a matter of law." <u>Owens v. Governor's Office of Student Achievement</u>, 52 F.4th 1327, 1333 (11th Cir. 2022) (internal quotation marks omitted).

## II.

Dr. Walls is a physician who is board certified in pediatrics and pediatric emergency medicine.  Lee Health employed her between August 6, 2019, and October 14, 2021, pursuant to an Employment Agreement (Doc. #46-2, pp. 58-75) as a full-time pediatric emergency room physician at Golisano Children's Hospital.

Lee Health is a special district of the State of Florida created by chapter 2000-439, Laws of Florida, which operates a public health care system in Lee County, Florida.  (Doc. #1, ¶ 2.) Lee Health operates six hospitals and several other facilities and employs over 14,000 people.  (Doc. #51-2.)

The general job requirements for Lee Health physicians appear in a Job Description Worksheet (Doc. #46-2, pp. 1-2), with more specific requirements in the Employment Agreement, (id. at 58-75.) In addition to possessing medical knowledge and skills, Dr. Walls was required to work in a fast-paced environment, to constantly be on her feet, to bend, squat, and lift, and to move things over 10 pounds.  She has described her job as "busy and demanding."  (Doc. #51-1, ¶ 17.)  She worked ten- or twelve-hour night shifts, during which she had to have direct contact with and provide clinical care to patients.  She was required to work seventeen to nineteen shifts each month.  (Doc. #46-1 at 72:16-21.)

The global COVID-19 pandemic in 2020 caused a significant increase in patients at Lee Health's emergency rooms and a shortage

- 6 -

of healthcare providers. In late September 2020, Dr. Walls contracted COVID-19, and she later developed severe debilitating complications known as Long COVID. Dr. Walls characterizes Long COVID as "a disabling and chronic condition." (Doc. #51-1, ¶ 4.) The Center for Disease Control defines Long COVID as a "serious illness" that "may cause disability," with "a wide range of ongoing symptoms and [chronic] conditions that can last weeks, months, or even years."[2] Lee Health does not dispute that Dr. Walls' Long COVID constitutes a "disability" or "handicap" under the relevant statutes.

***Leave from September 2020 to April 2021.*** The pediatric emergency room at Golisano was managed by Ms. Kathryn M. McGonegal ("Ms. McGonegal"), the Director of Hospital Based Physician Services, and Dr. Carmen Garcia ("Dr. Garcia"), a Medical Director. On September 28, 2020, Dr. Walls began experiencing acute upper respiratory symptoms, causing her to take medical leave. (Doc. #46-4 at 31, 37.) At the time, she informed Lee Health that she would make up her missed shifts when she returned on October 6. (Id. at 31–32.)

On October 2, Dr. Walls told Lee Health she anticipated

---

[2] *Long COVID Basics*, CTR. DISEASE CTRL. (July 11, 2024), https://www.cdc.gov/covid/long-term-effects/index.html; Greenhalgh, et al., *Long COVID: A Clinical Update*, 404 LANCET 707, 708 (2024) (confirming "findings from studies showing that this condition is [affecting] people's ability to work in paid employment").

returning to work on October 9, and would "pay shifts back later this month." (Id. at 41.) That did not occur, however, because Dr. Walls was hospitalized between October 7 and October 13. (Id. at 12.) On October 20, Dr. Walls informed Lee Health that she would not be cleared to return to work by Lee Health's Employee Health Department any sooner than November 21 and that she was "working on . . . FMLA paperwork."[3] (Id. at 35-36, 43.)

As it turned out, Dr. Walls took leave for over twenty-seven weeks. (Doc. #46-3, 136:25-137:2.) She used twelve weeks of FMLA leave, and when that ran out, she requested non-FMLA leave, which Lee Health granted. (Id. at 120:16-25.) Altogether, Dr. Walls' non-FMLA leave lasted about fifteen weeks. During Dr. Walls' absence, Lee Health sometimes used the services of a temporary physician. (Doc. #51-3, p. 1.) Nonetheless, Dr. Walls states that while she was on leave Ms. McGonegal and Dr. Garcia mentioned "on multiple occasions" that "the other physicians were allegedly tired of covering [her] shifts because of [her] medical leave." (Doc. #51-1, ¶ 31.)

In an email on November 9, 2020, Ms. McGonegal suggested that Dr. Walls begin with some partial shifts whenever she obtained a return-to-work date. (Doc. #51-3, p. 1.) In March 2021, Dr. Walls

---

[3] Under the FMLA, eligible employees are entitled to take up to 12 weeks of "leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position." 29 U.S.C. § 2612(a)(1)(D).

obtained a return-to-work date for April 2021. Prior to her return, Dr. Walls verbally requested a reduced work schedule, prompting discussions about her upcoming shifts, their frequency, and their length. Dr. Walls testified in her deposition (Docs. ##46-1, 46-3, 46-5) that her April schedule was the product of an interactive process with Ms. McGonegal. Ms. McGonegal initially proposed to have Dr. Walls "come back working ten-hour shifts," but Dr. Walls disagreed. After some discussion, they "worked out" and "agreed on" a "step-up schedule" under which Dr. Walls would "work two six-hour shifts, three eight-hour shifts, and three ten-hour shifts." (Doc. #46-3, 132:17-25, 133:1-7, 19-25.) On this point, Ms. McGonegal's affidavit testimony is consistent with Dr. Walls' deposition testimony. (Doc. #46-7, ¶ 12.)

On March 15, 2021, Ms. McGonegal informed Dr. Walls' co-workers that upon Dr. Walls' return, she would "do some shorter shifts and mid-shifts to get started again," and then "transition back to nights at the end of April." (Doc. #46-4, p. 55.)

On March 31, 2021, Dr. Walls visited Dr. Krishna P. Raju ("Dr. Raju"), her pulmonologist, who completed a return-to-work form stating that Dr. Walls could return on April 7, 2021, with reduced hours for one month, then resume work as tolerated. (Id. at 54.) That form was not provided to Lee Health, and Dr. Walls agrees that Dr. Raju did not "state how reduced [her] hours needed to be during that month." (Doc. #46-3, 127:8-128:3, 135:4-11.) Ms.

- 9 -

McGonegal testified that Dr. Walls never provided her with a doctor's note or documentation requesting an accommodation in April 2021. (Doc. #46-7, ¶ 12-15.)  And Dr. Walls testified that she does not recall or have any record of doing so.  (Doc. #46-3, 127:22-23, 129:23-130:1, 134:6-9, 17-23.)

*April 2021 Return to Work.*  Dr. Walls returned to work on a reduced schedule on April 7, 2021.  But contrary to her prior testimony, she now maintains that Ms. McGonegal agreed to shortened shifts for "a month" starting on April 7, 2021.  (Doc. #51-1, ¶ 37.)  She further asserts that her request for a month of shorter shifts "was not granted," and that after "less than two weeks" she was no longer scheduled for shorter shifts.  (Id. at ¶¶ 39-40.)

On April 14, Dr. Walls had a televisit with her primary care provider, Dr. Damien Hanekom ("Dr. Hanekom").  Dr. Walls told Dr. Hanekom that she was "[o]verall doing okay" with the implemented schedule.  (Doc. #46-4, p. 59.)  Dr. Hanekom "strongly advised" her to stick to a reduced schedule of "8-10 hours max" with "no more than 2 shifts in a row" until May 7 "at least."  (Id. at 61.) There is no evidence that Dr. Hanekom's advice was ever communicated to Lee Health or anyone other than Dr. Walls.  (Doc. #46-3, 129:23-130:1; 134:13-23.)  Dr. Walls did not request that Lee Health further modify her reduced return-to-work schedule.

The record of the eleven shifts Dr. Walls worked in April 2021 is set forth below:

| DATE | HOURS WORKED |
|------|--------------|
| April 7 | 1:00pm to 7:00pm |
| April 8 | 4:00pm to 10:00pm |
| April 9 | OFF |
| April 10 | OFF |
| April 11 | OFF |
| April 12 | 2:00pm to 10:30pm |
| April 13 | 1:00pm to 10:45pm |
| April 14 | OFF |
| April 15 | OFF |
| April 16 | OFF |
| April 17 | OFF |
| April 18 | 11:00am to 10:00pm |

| DATE | HOURS WORKED |
|------|--------------|
| April 19 | 11:15am to 10:45pm |
| April 20 | OFF |
| April 21 | 1:00pm to 11:00pm |
| April 22 | OFF |
| April 23 | 6:00pm to 6:00am |
| April 24 | 6:00pm to 6:00am |
| April 25 | OFF |
| April 26 | OFF |
| April 27 | OFF |
| April 28 | 6:00pm to 6:00am |
| April 29 | 6:00pm to 6:00am |
| April 30 | OFF |

(Doc. #46-7, p. 25.)

Dr. Walls then began working her usual 12-hour night shifts for almost five months. During that time period, she did not report any work-related issues or request any other accommodations. Nor did she provide Lee Health any doctors' notes indicating a need for shorter or fewer shifts.

*September 2021 Flare-Up and October 2021 Request for Accommodation.* On September 27, 2021,[4] Dr. Walls had a flare up of her symptoms, went home, and was never cleared to return to work. (Doc. #51-1, ¶ 53.) The medical records concerning her condition and treatment are mostly immaterial to the summary judgment motion because Lee Health does not challenge that Dr. Walls has a disability or handicap.

---

[4] Dr. Walls states that her last workday was September 27, 2021. (Doc. #51-1, ¶ 53.) But Lee Health's records show her last shift as September 20, 2021. (Doc. #46-7, p. 25.) This discrepancy is immaterial, and at any rate, the Court credits Dr. Walls' position.

On October 6, 2021, Dr. Walls emailed Ms. McGonegal and Dr. Garcia to inform them that she was "not cleared to return to work." (Doc. #46-4, p. 65.) She stated: "I am having a prolonged course of labyrinthitis with hearing loss and vertigo and just started vestibular rehabilitation for balance problems. This is likely post viral and from my prolonged course with covid infection and unfortunately, I continue to have challenges due to long covid syndrome." (Id.) Dr. Walls continued that she had been advised by her physicians to "withdraw from direct patient contact and clinical care for [her] own health and safety." (Id.) She stated that "this is now a permanent condition that limits my life activities." (Id.)

Dr. Walls' email requested two accommodations from Lee Health: "1. Additional time off of work until I am cleared to return by my physician. I will be in rehabilitation for the next month and should be able to return shortly thereafter" and "2. Transfer to a position that does not involve direct patient contact or clinical care so that I can continue to work within the system but in another capacity." (Id.) Dr. Walls recognized that she could not work as an emergency pediatric physician since she had to withdraw from direct patient care. (Doc. #46-1, 60:22-61:1.)

When she wrote that email, Dr. Walls did not know when or if she would be cleared to return to work. Additionally, she did not know of, and had not searched for, any open positions at Lee Heath

for which she was qualified, and which did not involve direct patient contact or clinical care.

**Ability to Work as of September-October 2021.** Dr. Walls testified that during her last shifts in September 2021, she could not "climb, balance, stoop, kneel, crouch, crawl, reach, bend, push, pull, [or] use manual dexterity." (Doc. #46-1, 22:20-23:11.) She could only handle "[r]eaching, standing, walking, handling, and driving [for] less than 2.5 hours a day." (Id. at 23:12-18.) She had "less than sedentary" physical capacity. (Id. at 24:12-17.) She had "brain fog," "word-finding difficulties," and "worsening fatigue." (Id. at 29:15-20.) When she later "attempt[ed] to work at a computer-based position for 8 hours a day," she was "unable to sleep . . . due to constant burning pain in [her] right arm," and had difficulty "looking at a computer screen for any prolonged period." (Id. at 30:1-8.) She also had "numbness and tingling in [her] upper right extremity" which made her "unable to do . . . fine motor work or computer work." (Id. at 28:6-13.)

Dr. Walls testified that on her last day at Lee Health she was performing a "lumbar puncture" on an infant. (Doc. #46-5, 197:21-25.) It was a "delicate procedure" that involved "sticking a small needle in the lower back of an infant to check [for] infection in the fluid that goes around the brain and the spinal cord." (Id.) As she was performing the procedure, Dr. Walls lost

feeling in her thumb, then noticed that her head hurt and her "right arm felt tingly." (Id. at 198:3-14.) Dr. Walls admits that "it was probably not safe" to continue, but she did, and was "[l]uckily" able to complete the procedure. (Id.)

**_Termination._** On October 14, 2021, Dr. Walls attended a meeting with Ms. McGonegal, Dr. Garcia, Dr. Emad Salman, an Assistant Medical Director, and Mr. Mark Horton, a System Director. (Doc. #51-11, p. 1.) Dr. Walls testifies that Mr. Horton said she had "taken too much time off" and then fired her. (Doc. #51-1, ¶ 63.) Ms. McGonegal testifies that Dr. Walls was also told that Lee Health "could not accommodate her request for indefinite leave, especially since Lee Health was already short staffed and still handling the COVID-19 pandemic." (Doc. #46-7, ¶ 22.) Dr. Walls was also told that her requests could not be granted as "she could no longer perform the essential functions of her job with or without reasonable accommodation" and "there were no non-clinical and non-patient facing positions into which to place her upon her return to work." (Id.)

Dr. Walls' Employment Agreement allowed Lee Health to terminate her for cause if she was unable to perform her essential duties as a result of disability or impairment for at least 25 hours per week for at least 20 weeks in any 52-week period. (Doc. #46-2, p. 64.) Lee Health asserts that since Dr. Walls took over 200 days of leave between September 28, 2020, and September 28,

2021, she could have been immediately fired for cause under Section 10(c)(iv) of her Employment Agreement. (Id.) Nonetheless, Lee Health chose to fire her "without cause" under Section 10(b) of that agreement. (Id. at 63-64.) In lieu of a 90-day notice period, Lee Health agreed to pay Dr. Walls a lump sum amount of $78,001.56, less applicable taxes, which constituted 90 days of severance pay. (Doc. #46-4, p. 66.)[5]

On December 30, 2021, Dr. Walls filed a Notice of Injury/Illness with Lee Health, asserting that her disability dating from September 20-21, 2020, was work related. (Doc. #46-2 at 88-89.)

**Post-Termination Social Security Disability Benefits.** After being fired, Dr. Walls applied for and began receiving disability benefits through Lee Health's disability provider, The Hartford Insurance Company ("Hartford"). (Doc. #51-1, ¶ 78.) As a condition of receiving those benefits, Dr. Walls had to apply for Social Security Disability Insurance ("SSDI") benefits with the Social Security Administration ("SSA"). (Id. at ¶ 79; Doc. #46-2, pp. 3-9.) Dr. Walls provided information to a Hartford representative, who completed Dr. Walls' SSDI application.

In the application, Dr. Walls swore "under penalty of perjury"

---

[5] Lee Health also discovered a prior under-payment, resulting in a payment of $7,525.44 being due to Dr. Walls. Therefore, the total payout amount was $85,527.00, less applicable taxes. Id.

that she was unable to work as of September 27, 2021. (Doc. #46-2, p. 9; Doc. #46-1, 18:5-24.) She agreed with Dr. Hanekom's assessment that there are "no" "workplace accommodations that would help [her] return to work." (Doc. #46-1 at 24:18-24.) Dr. Walls herself could not identify "any" accommodations that would have allowed her to do her job any time after "October 1, 2021." (Id. at 27:9-12.) She testifies that the information in her SSDI application "was accurate," and that she "could no longer perform as a pediatric emergency room physician, [her] trained profession, or anything similar to it, due to the exacerbation of [her] long COVID symptoms following [her] termination." (Doc. #51-1, ¶ 82.) Dr. Walls was awarded monthly SSDI benefits retroactive to September 2021.

**Post-Termination Employment.** From January 3 to January 14, 2022, Dr. Walls worked at a desk job with Versalus Health as their "medical director of regulatory affairs" providing healthcare consulting. (Doc. #46-1, 42:6-45:17) She resigned because she was "physically [un]able" to do that job (id. at 43:7-19), and has testified that there are "no accommodations" that would have made any difference, (id. at 44:3-6.) Dr. Walls also testified she cannot work a part-time job, sit at a desk, work remotely, or even work *without* a schedule of required hours. (Id. at 45:8-15.)

**Continued Medical Conditions Prevent Employment.** On November 7, 2022, in connection with a private claim for disability

insurance (Doc. #46-1, 20:22-25), Dr. Walls submitted a detailed description of her current medical condition to Massachusetts Mutual Life Insurance Company ("MassMutual"), (Doc. #46-2, pp. 13-18, 35-40.)  Dr. Walls' description of her condition at the time clearly indicated she could perform virtually no work, much less that required of a pediatric emergency room physician.

On November 21, 2022, Dr. Hanekom completed an Attending Physician's Statement of Disability form for MassMutual.  (Id. at 22-24.)  Out of seventeen categories of physical capability, Dr. Hanekom wrote that Dr. Walls was "[n]ot at all" able to do eleven, and could only "[o]ccasionally" do five.  (Id. at 23.)  The only physical activity she could do "[f]requently" was sitting.  (Id.)

Also on November 21, Dr. Hanekom wrote a letter for Dr. Walls where he stated that due to a decline in her overall health and the severity of her medical conditions, "she is currently NOT a candidate for job retraining."  (Doc. #46-2 at 41.)  Dr. Hanekom concluded that if Dr. Walls' medical conditions stayed at their current severity, she *would not be able to work* "*in any occupation for the rest of her life.*"  (Id.)

Dr. Walls has agreed that as of March 2023 she can only "pay attention and concentrate for 10 minutes at a time" and cannot follow verbal instructions very well.  (Doc. #46-1, 52:7-19.)

Additional facts will be set out as needed to discuss specific issues.

III.

Dr. Walls claims that Lee Health engaged in disability discrimination under the ADA (Count I) and FCRA (Count II) by (1) failing to provide reasonable accommodations, and (2) terminating her employment.  Lee Health seeks summary judgment on both counts.

### A.  Substantive Legal Principles

The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability" with regard to the "discharge of employees, . . . and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  The FCRA similarly forbids employers from discriminating "against any individual" "because of" his or her "handicap[.]"  Fla. Stat. § 760.10(1)(a).  Florida courts construe the FCRA's language in conformity with that of the ADA, even where the statutory language is similar, but not identical.  Ring v. Boca Ciega Yacht Club, Inc., 4 F.4th 1149, 1156 (11th Cir. 2021).  In addition, ADA and FCRA disability discrimination claims are analyzed under the same framework.  Chanda v. Engelhard/ICC, 234 F.3d 1219, 1221 (11th Cir. 2000); D'Onofrio v. Costco Wholesale Corp., 964 F.3d 1014, 1021 (11th Cir. 2020).

### (1)  Burden-Shifting Framework

When an employee seeks to prove disability discrimination or retaliation by circumstantial evidence, courts generally apply the McDonnell Douglas burden-shifting framework.  See Owens, 52 F.4th

at 1337-38; Holly v. Clairson Indus., LLC, 492 F.3d 1247, 1255 (11th Cir. 2007). Under that framework, an employee must first establish a prima facie case of disability discrimination or retaliation. If the employee does so, the employer must then articulate "a legitimate, non-discriminatory reason for the challenged action." Wascura v. City of S. Miami, 257 F.3d 1238, 1242 (11th Cir. 2001). If the employer articulates such a reason, the employee must present evidence showing that the employer's proffered reason is pretextual, such that the employer's conduct could constitute intentional discrimination. Id. at 1243; see also Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 143 (2000). "This final question of pretext merges with the plaintiff's ultimate burden of persuading the factfinder that she has been the victim of intentional discrimination. In other words, the pretext prong of McDonnell Douglas is just the ordinary summary judgment standard." McCreight, 117 F.4th at 1335 (citation and punctuation omitted).

**(2)  Convincing-Mosaic Framework**

The McDonnell Douglas burden-shifting framework is not the only way to survive summary judgment where an employee's claim is based on circumstantial evidence. Owens, 52 F.4th at 1337 n.2; Smith, 644 F.3d at 1328.[6] An employee may defeat summary judgment

---

[6] Thus, Lee Health is incorrect in stating that Dr. Walls "must" use McDonnell Douglas' burden-shifting framework in this

by introducing evidence sufficient for a jury to infer intentional discrimination or retaliation.  Id.  Such evidence may include, *inter alia*, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) superior treatment of similarly situated workers, or (3) pretextual reasons for the employer's action.  Jenkins v. Nell, 26 F.4th 1243, 1250 (11th Cir. 2022).

**(3)  Elements**

To establish a prima facie case of disability discrimination under the ADA, an employee must show that she was (1) disabled; (2) a qualified individual; and (3) subjected to unlawful discrimination because of her disability.  Holly, 492 F.3d at 1255–56; Greenberg v. BellSouth Telecomms., Inc., 498 F.3d 1258, 1263 (11th Cir. 2007); Frazier-White v. Gee, 818 F.3d 1249, 1255 (11th Cir. 2016).  Disability discrimination may be established by showing a failure to provide a reasonable accommodation.  Holly, 492 F.3d at 1262.  To establish a prima facie case of discrimination for failure to accommodate, an employee must show that she (1) was a qualified individual with a disability; (2) made a specific request for a reasonable accommodation; and (3) her employer failed to provide an accommodation or to engage in the interactive process required to identify one.  D'Onofrio, 964

---

circumstantial evidence case.  (Doc. #46, p. 14.)

F.3d at 1021.

**(4) Qualified Individual**

The ADA defines "qualified individual" as "an individual" with a disability "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). An employee must thus show that she can perform her job's essential functions without accommodation, or with reasonable accommodation. Davis v. Fla. Power & Light Co., 205 F.3d 1301, 1305 (11th Cir. 2000). If she cannot perform an essential function of her job even with an accommodation, she is not a "qualified individual" under the ADA. Id. "Because the ADA reserves its protections for individuals still able to perform the essential functions of a job, albeit perhaps with reasonable accommodation, a plaintiff who is totally disabled and unable to work at all is precluded from suing for discrimination thereunder." Slomcenski v. Citibank, N.A., 432 F.3d 1271, 1280 (11th Cir. 2005) (collecting cases.)

The essential functions of an employment position are determined on a case-by-case basis.

> Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors. The ADA provides that consideration shall be given to the employer's judgment as to what functions of a job are essential and the employer's written description for that job. See 42 U.S.C. § 12111(8). The ADA regulations provide that other factors to consider are: (1) the amount of time spent on the job performing the function, (2) the consequences of not requiring the incumbent to

> perform the function, (3) the terms of the collective
> bargaining agreement, (4) the work experience of past
> incumbents in the job, and (5) the current work
> experience of incumbents in similar jobs. See 29 C.F.R.
> § 1630.2(n)(3)(1999).

Davis, 205 F.3d at 1305).

> In addition, the EEOC regulations identify three
> nonexclusive bases on which a job function may be deemed
> essential: "(1) the reason the position exists is to
> perform the function; (2) there are a limited number of
> employees available among whom the performance of the
> job function can be distributed; and (3) the function is
> highly specialized so that the incumbent in the position
> was hired for his or her expertise or ability to perform
> the particular function."

Holly, 492 F.3d at 1258-59 (citing 29 C.F.R. § 1630.2(n)(2)).

### (5)  Reasonable Accommodation

"The ADA requires an employer to make 'reasonable
accommodations' to an otherwise qualified employee with a
disability, 'unless doing so would impose [an] undue hardship.'"
Frazier-White, 818 F.3d at 125 (quoting Lucas v. W.W. Grainger,
Inc., 257 F.3d 1249, 1255 (11th Cir. 2001) (citing 42 U.S.C. §
12112(b)(5)(A) and 29 C.F.R. § 1630.9(a))).  A plaintiff bears the
burden of both identifying an accommodation and showing it is
reasonable. Frazier-White, 818 F.3d at 1255; Willis v. Conopco,
Inc., 108 F.3d 282, 284-86 (11th Cir. 1997).  An employer's
obligation to accommodate is not triggered unless the employee
makes a specific demand for an accommodation, Frazier-White, 818
F.3d at 1256; Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d
1361, 1363 (11th Cir. 1999), with enough information to "link" the

disability to the requested accommodation, i.e., "by explaining how the requested accommodation could alleviate the workplace challenges posed by her specific disability," Owens, 52 F.4th at 1335.

A qualified individual with a disability is only entitled to a reasonable accommodation, not the accommodation of her choice. Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1285-86 (11th Cir. 1997). Thus, the ADA does not impose liability on an employer who fails to provide "all the accommodations [an employee] feels are appropriate." Doe v. Dekalb Cty. Sch. Dist., 145 F.3d 1441, 1451 (11th Cir. 1998); D'Onofrio, 964 F.3d at 1029. What counts as a reasonable accommodation depends on the circumstances. Frazier-White, 818 F.3d at 1255.

### B. Lee Health's Summary Judgment Grounds

Dr. Walls claims that Lee Health failed to accommodate her reasonable request in April 2021 and her two reasonable requests in September-October 2021, and unlawfully terminated her employment in October 2021 because of her disability or handicap. (Doc. #46, p. 14.) Lee Health does not dispute that Dr. Walls has a disability or handicap, so that element is not discussed further. The Court turns first to the April 2021 accommodation request, and next, to the events culminating in the October 2021 termination.

### (1) April 2021 Accommodation Request

Dr. Walls asserts that when she returned to work in April

2021, Lee Health did not provide the accommodation previously agreed upon.  Dr. Walls maintains that she verbally requested a monthlong shortened work schedule, which Ms. McGonegal agreed to. But Dr. Walls asserts that less than two weeks after returning on April 7, she was no longer scheduled for shortened shifts.  Dr. Walls maintains that this failure to accommodate violated both the ADA and FCRA.  (Doc. #51, pp. 10-12.)

Although a reasonable accommodation may include "part-time or modified work schedules," 42 U.S.C. § 12111(9)(B), part-time employment may or may not be a reasonable accommodation depending on the specifics of an employment situation.  Terrell v. USAir, 132 F.3d 621, 626 (11th Cir. 1998).  Lee Health does not address whether full-time work was essential to Dr. Walls' job.  Rather, it argues that the temporary shortened work schedule it provided was reasonable under the circumstances, and agreed to by Dr. Walls.

Lee Health seeks summary judgment as to this claim, asserting that Dr. Walls: (a) was not a qualified individual; (b) never requested a part-time schedule under Lee Health's Accommodation Policy, or provided any documentation about her need for reduced hours or the duration of that need; (c) received a reasonable accommodation; and (d) never notified Lee Health that she was having difficulty working her scheduled shifts upon her return to work.  (Doc. #46, pp. 14-20.)

The Court takes each argument in turn.

**(a)  Qualified Individual**

Lee Health argues that Dr. Walls was not a qualified individual in April 2021. (Doc. #46, p. 18.)  Dr. Walls testified that when she returned to work in April 2021, she could "barely keep up," was "slow," "couldn't find words," "couldn't do procedures well," and was "having trouble giving instructions to the nurses." (Doc. #46-5, 195:15–22.)  She also had "short[ness] of breath" and "pain" and "tightness" in her chest.  (Id. at 195:23–196:3.)  Nevertheless, the reduced work schedule in April implemented by Ms. McGonegal accomplished its objective of allowing Dr. Walls to work her way back into a full-time schedule and resume her job functions for almost five more months before her symptoms flared up again.  While working was no doubt difficult at times for Dr. Walls, she performed her essential job functions during that time period.

The record establishes that with the accommodations she received, Dr. Walls *could* perform the essential functions of her job in April 2021 and for about five months thereafter.  Accordingly, Lee Health's argument that Dr. Walls was not a qualified individual in April 2021 is rejected.

**(b)  Failure to Request Part-Time Work**

Lee Health argues that it is entitled to summary judgment because Dr. Walls never requested a part-time schedule upon her return to work in accordance with Lee Health's Accommodation

Policy, or provided any doctor's note or documentation about her need for a schedule reduction. (Doc. #46, pp. 18-19.) It is undisputed that Dr. Walls made a verbal request to Ms. McGonegal, which Lee Health acted upon. That verbal request and the information provided about Dr. Walls' Long COVID was sufficient for Lee Health to refine a schedule accommodation, which Dr. Walls accepted. Whether or not that verbal request complied with Lee Health's Accommodation Policy, it was a sufficient request for accommodation under the ADA and FCRA. Owens, 52 F.4th at 1335-37. Lee Health's argument to the contrary is rejected.

**(c)  Reasonable Accommodation Received By Dr. Walls**

Dr. Walls maintains in her Affidavit that she requested, and Ms. McGonegal agreed to, shortened shifts "for a month starting April 7, 2021," but that after less than two weeks, she was no longer scheduled for shortened shifts. (Doc. #51-1, ¶ 37, 40.) Dr. Walls' Affidavit contradicts her prior deposition testimony and cannot be used to create a genuine issue of material fact.

As summarized earlier, Dr. Walls testified in a deposition that her April 2021 schedule was the product of an interactive process, where she and Ms. McGonegal agreed to a "step-up" schedule. During the deposition, counsel stated: "you told me that the initial plan for your work shifts that you had agreed to with Kate were two six-hour shifts, three eight-hour shifts, and three ten-hour shifts, correct?" Dr. Walls responded, "Yes." (Id.,

132:17-23.)  Counsel then asked if Ms. McGonegal's March 15, 2021,
email stating that Dr. Walls would return on April 7 and "start
with short shifts, go to mid shifts, and go to regular shifts" was
"consistent with what [they] had worked out together."  Dr. Walls
again responded, "Yes." (Id., 133:1-7.)

> The law in this circuit is that a party cannot give clear
> answers to unambiguous questions in a deposition and
> thereafter raise an issue of material fact in a
> contradictory affidavit that fails to explain the
> contradiction. When this occurs, the court may disregard
> the affidavit as a sham. We apply this rule sparingly
> because of the harsh effect this rule may have on a
> party's case. In addition, we feel that to allow every
> failure of memory or variation in a witness' testimony
> to be disregarded as a sham would require far too much
> from lay witnesses and would deprive the trier of fact
> of the traditional opportunity to determine which point
> in time and with which words the [affiant] was stating
> the truth. Thus, our cases require a court to find some
> inherent inconsistency between an affidavit and a
> deposition before disregarding the affidavit.  If no
> inherent inconsistency exists, the general rule allowing
> an affidavit to create a genuine issue even it if
> conflicts with earlier testimony in the party's
> deposition governs. In these instances, any conflict
> or discrepancy between the two documents can be brought out
> at trial and considered by the trier of fact.

Rollins v. TechSouth, Inc., 833 F.2d 1525, 1530 (11th Cir.
1987)(citations, internal quotation marks, punctuation, and
footnote omitted).

    Dr. Walls' clear answers in her prior deposition are
inherently inconsistent with her later-filed Affidavit.  She also
described the plan as-implemented as the product of an interactive
process and told Dr. Hanekom that she was "[o]verall doing okay"

under it. (Doc. #46-3, 132:17–133: 7; Doc. #46-4, p. 59.)

Even if Dr. Walls' contradictory affidavit testimony were accepted, she has no viable cause of action for April 2021. The accommodation she received, which succeeded for five months, was reasonable.  Dr. Walls does not dispute that she worked from April until her condition flared up in September 2021.  An employee is only entitled to a reasonable accommodation, not the accommodation of her choice.  Stewart, 117 F.3d at 1285-86.  No evidence supports Dr. Walls' conclusory statement that the manner of her reintegration caused her health to spiral; her mere conclusions, speculations, and unsupported allegations are legally insufficient to create a genuine issue of material fact.  Harris v. Pub. Health Tr. of Miami-Dade Cty., 82 F.4th 1296, 1306 (11th Cir. 2023); TocMail, Inc. v. Microsoft Corp., 67 F.4th 1255, 1263 (11th Cir. 2023); Valderrama v. Rousseau, 780 F.3d 1108, 1112 (11th Cir. 2015).

### (d)  No Request for Modification of Accommodation Provided

Dr. Walls attests in her later-filed Affidavit that within two weeks, she realized she was not being given the monthlong accommodation she requested.  Lee Health asserts that Dr. Walls never stated that she was having difficulty working her scheduled shifts.  (Doc. #46, p. 19.)  Dr. Walls has admitted as much. (Doc. #46-5, 190:15–17.)  She also concedes that she did not request any modifications to the April accommodation, but claims that was

because she feared she would be fired.  (Doc. # 51-1, ¶ 42.)

As discussed earlier, Dr. Walls bears the burden to both identify an accommodation and show that it is reasonable. Frazier-White, 818 F.3d at 1255; Willis, 108 F.3d at 284-86.  An employer's obligation to provide a reasonable accommodation is not triggered unless the employee makes a specific demand for an accommodation. Frazier-White, 818 F.3d at 1256; Gaston, 167 F.3d at 1363.  Dr. Walls did not request or identify any new accommodation or modification of the existing one.  Lee Health had no obligation to modify the ongoing accommodation or provide a new one absent a specific demand from Dr. Walls, which never came.

Summary judgment is granted in favor of Lee Health on Count I and Count II as to the April 2021 accommodation claims.

**(2)  September—October 2021 Accommodation Requests and Termination**

Dr. Walls requested two accommodations in September-October 2021: first, that she be given a leave of absence of unspecified duration, and second, that upon her return to work she be transferred to another position within the Lee Health without patient contact.  Lee Health denied both requests and fired her. Dr. Walls asserts that she would have been able to work with the requested accommodations, which were reasonable, and that therefore the failure to accommodate her and the decision to fire her violated the ADA and FCRA.

Lee Health seeks summary judgment as to both accommodation requests and Dr. Walls' termination. Lee Health asserts that Dr. Walls was not (a) a qualified individual, (b) denied a reasonable accommodation, or (c) terminated "because of" her disability or handicap. (Doc. #46, pp. 17-22.)

The Court discusses each element in turn.

**(a)   Qualified Individual**

As discussed earlier, a "qualified individual" is "an individual" with a disability "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Dr. Walls does not assert that she could perform the essential functions of her job as an emergency room pediatric physician without accommodation, so she must show that she could do so with one or more reasonable accommodations. Davis, 205 F.3d at 1305. If Dr. Walls could not perform an essential function of her job, even with accommodations, she is not a "qualified individual." Id. If she was "totally disabled" and unable to work at all, she is precluded from suing for disability discrimination. Slomcenski, 432 F.3d at 1280.

There are four sources of undisputed, compelling evidence that Dr. Walls was not a qualified individual when her two accommodation requests were denied, and her employment terminated: (i) her sworn statements about her condition and abilities at the

time; (ii) her evaluation by her primary physician; (iii) her sworn application for SSDI benefits; and (iv) her unsuccessful attempt to engage in sedentary employment after being fired.

The record establishes that beginning September 20, 2021, Dr. Walls asserted that she was unable to perform multiple essential functions of her job as a pediatric emergency room physician. Her description of her condition and inability to work in September to October 2021, summarized earlier, establishes that she was not a "qualified individual." On November 1, 2021, her primary physician opined that the only physical activity Dr. Walls could perform frequently was sitting, and that because of a decline in her overall health and the severity of her medical conditions, she was not a candidate for job retraining. Given Dr. Walls' condition at the time, Dr. Hanekom concluded that she would not be able to work in any occupation for the rest of her life. The record thus clearly establishes that Dr. Walls could not perform multiple, essential functions of her job.[7]

Dr. Walls now argues, however, that she was qualified and able to work prior to her October 14, 2021, termination. (Doc. #51, pp. 18-20.) She asserts that before being fired, "she was

---

[7] "Q. Are you able to identify any [accommodations] that would enable you to perform your job between October 1, 2021, and the present? A. I am not." (Doc. #46-1, 27:9-12); see also id. at 24:7-17 (agreeing that the "symptoms and limitations" "on [her] physician statement of disability" applied "from September 27, 2021, to the present.").

qualified for other work" and "could have been reasonably accommodated." (Id. at 19–20.)

Whether Dr. Walls was qualified for "other work" has no bearing on whether she was a "qualified individual" for her job as a pediatric emergency room physician. That is the job for which she needed to be qualified, and she clearly was not. Dr. Walls herself requested an accommodation that precluded her employment in that role — no patient contact.

Additionally, Dr. Walls applied for SSDI benefits and described her condition at the time of the termination. In her SSDI application, she swore that she was unable to work as of September 27, 2021. (Doc. #46-2, p. 3.) When an applicant for SSDI benefits swears, under penalty of perjury, to her inability to work in order to qualify for benefits, she may be estopped in a subsequent ADA action from asserting that she was able to perform her job's essential functions. Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806–07 (1999); Frazier-White, 818 F.3d at 1257. Such a person is not "automatically" estopped from pursuing a later ADA claim, but she "cannot simply ignore her [earlier] SSDI contention that she was too disabled to work." Cleveland, 526 U.S. at 797–98. Rather, she "must explain" how her earlier contentions are "consistent with" her later assertions that she could perform her job's essential functions with reasonable accommodation. Id. at 798.

Dr. Walls has not done so.  She attests that the statements in her SSDI application were "accurate" (Doc. #51-1, ¶ 82), but at the same time asserts that she could have done other work, and that being terminated "worsen[ed] her health . . . eventually render[ing] her unable to work."  (Doc. #51, pp. 18-19.)  That is insufficient.  Dr. Walls' subsequent, unsuccessful attempt to work at another less-strenuous medical job at Versalus also supports a finding that she was not a qualified to be a pediatric emergency room physician.

Even if Dr. Walls was a qualified individual, neither of her requested accommodations were reasonable, as discussed below.

**(b)  Unreasonable Requested Accommodations**

Dr. Walls proposed two accommodations: (1) an indeterminate extension of her non-FMLA leave status until she was able to work, and (2) after the leave, transfer to some other, unspecified position within the Lee Health system.  Lee Health argues that her requests were not reasonable because Dr. Walls (1) essentially requested "indefinite" leave, which is "unreasonable as a matter of law" (Doc. #46, p. 19); and (2) has not shown that there were any open positions which she was able to perform and qualified for given her medical condition.  (Id. at 20.)

The Court agrees with Lee Health as to each requested accommodation.

**(i)  Extension of Leave of Absence**

Granting medical leave is one way an employer may accommodate an employee with a disability, but the requested leave must be reasonable.  "While a leave of absence might be a reasonable accommodation in some cases . . . an accommodation is unreasonable if it does not allow someone to perform his or her job duties in the present or in the immediate future." Wood v. Green, 323 F.3d 1309, 1314 (11th Cir. 2003).  This is true even if the employer previously granted periods of indefinite leave. "[A]n employer d[oes] not violate the [ADA] by 'refusing to grant [an employee] a period of time in which to cure his disabilities' where the employee 'sets no temporal limit on the advocated grace period, urging only that he deserves sufficient time to ameliorate his conditions.'" Duckett v. Dunlop Tire Corp., 120 F.3d 1222, 1226 (11th Cir. 1997) (quoting Myers v. Hose, 50 F.3d 278, 282 (4th Cir. 1995)).  A host of unpublished Eleventh Circuit cases have affirmed denials of unlimited leave requests similar to the one here.[8]

---

[8] Santandreu v. Miami Dade Cty., 513 F. App'x. 902, 905 (11th Cir. 2013); Roddy v. City of Villa Rica, 536 F. App'x. 995, 1001 (11th Cir. 2013); Skotnicki v. Board of Trs. Univ. of Ala., 631 F. App'x. 896, 899–900, 903 (11th Cir. 2015); Luke v. Board of Trs. Fla. A&M Univ., 674 F. App'x. 847, 850 (11th Cir. 2016); Billups v. Emerald Coast Utils. Auth., 714 F. App'x. 929, 934–35 (11th Cir. 2017); Adigun v. Express Scripts, Inc., 742 F. App'x. 474, 477 (11th Cir. 2018);  Monroe v. Florida Dep't of Corr., 793 F. App'x. 924, 927 (11th Cir. 2019); McNeal v. Macon Cty. Bd. of Educ., No. 23-10410, 2024 WL 4040838, at *3 (11th Cir. Sept. 4, 2024).

Dr. Walls claims that her request for additional leave in October 2021 was not indefinite, as she "specifically stated one month as the time period." (Doc. #51, pp. 12-13.) That is incorrect. Dr. Walls requested "additional time off of work until [she was] cleared to return by [her] physician," and mentioned that she would be "in rehabilitation for the next month." The length of her requested leave did not turn on the fixed duration of the rehabilitation program, but on the contingency of being cleared to return by her physician. On November 1, 2021 — within that thirty-day window — Dr. Walls' physician opined that she would likely not work "in any occupation for the rest of her life." Dr. Walls never received medical clearance to return to her job. Because she cannot show that she would have been able to perform her job's essential functions anytime in the reasonably immediate future, her request for additional leave was unreasonable.

**(ii) Transfer to Another Position**

Dr. Walls' second requested accommodation was that when she did return to work she be transferred to a position that did not require direct patient contact or clinical care. (Doc. #46-4, p. 65.) Dr. Walls recognizes that she could not work as a pediatric physician in the emergency department since she had to withdraw from direct patient care. (Doc. #46-1, 60:22-61:1.)

Dr. Walls asserts that Lee Health has "over 500 open positions . . . at any given time." (Doc. #51, ¶ 25.) In support,

she attaches screenshots of an undated search on the Lee Health
Jobs Portal. (Doc. #51-8, p. 1.) Dr. Walls does not identify the
search date, but metadata indicates that the document was created
on November 25, 2024, at 4:06 p.m. Obviously, this cannot support
her assertion as to the availability of other jobs in October 2021.

Dr. Walls argues, however, that her request for a transfer in
October 2021 was improperly denied even if she did not identify a
specific vacant position. (Doc. #51, p. 14.) She suggests that
if she had an opportunity to "discuss" open positions, she would
have found one. (Id. at 15–17.) This, however, puts the
proverbial cart before the horse.

An employer does not have to engage in the interactive process
when an employee fails to make a reasonable request for
accommodation. Owens, 52 F.4th at 1335; Earl v. Mervyns, Inc.,
207 F.3d 1361, 1367 (11th Cir. 2000) ("where a plaintiff cannot
demonstrate 'reasonable accommodation,' the employer's lack of
investigation . . . is unimportant." (quoting Willis, 108 F.3d at
285)); Lucas, 257 F.3d at 1256 n.2 (same); McNeal, 2024 WL 4040838,
at *3. Dr. Walls did not identify a reasonable accommodation.
Therefore Lee Health cannot be liable for failing to engage in an
"interactive process."

**(c) "Because of" Disability**

Lee Health argues that Dr. Walls was not fired "because of"
her disability, but for several legitimate business reasons.

– 36 –

Specifically, Lee Health asserts that Dr. Walls' employment was terminated because she was unable to work, could not provide a definite return-to-work date, and admitted that it was unsafe for her to be working with patients. (Doc. #46, pp. 20-21.)  Dr. Walls responds that any performance issues were, of necessity, not "unrelated to her disability," so her disability was unavoidably the but-for cause of her termination.  (Doc. #51, p. 18, 23.)

As further circumstantial evidence of improper intent, Dr. Walls asserts that Lee Health did not follow standard procedure in firing her.  (Id. at 20-22.)  An employer's deviation from its own standard procedures may serve as evidence of discrimination. Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1299 (11th Cir. 2006).  Dr. Walls argues that Lee Health: (i) failed to provide her an accommodation request form, an interactive process, or written documentation of her request; (ii) was "easily able to hire a locum tenens physician during [her] initial absence," and so could have done so again; (iii) violated its policy of giving disabled employees 30 days to find new positions; and (iv) failed to comply with Section 10(c)(iv) of the Employment Agreement, which mandates the "consideration" and "offer[ing]" of reasonable accommodations before firing an employee.  (Doc. #51, pp. 21-22.)

The policy language Dr. Walls cites does not support her argument.  First, Section 10(c)(iv) does not require Lee Health to offer Dr. Walls an accommodation.  (Doc. #46-2, p. 64.)  It merely

defines "Totally Disabled" to mean a physician's "inability . . . notwithstanding reasonable accommodations . . . to perform . . . essential duties . . . as a result of physical or mental disability or impairment." (Id.) At any rate, Lee Health fired Dr. Walls under Section 10(b), not Section 10(c)(iv). (Id. at 63-64.) *Second*, no policy required Lee Health to give Dr Walls 30 days to find a new position. Employees on non-FMLA leave whose positions are "filled" have 30 days of "personal leave" to apply for another position. (Doc. #51-4, p. 1.) But Dr. Walls' position was not filled when she was fired, and she received the equivalent of 90 days of paid leave. Further, no policy required Lee Health to hire a *locum tenens* physician. Lee Health "may" determine that the position of an employee on non-FMLA leave needs to be filled "based on operational needs." (Id.) But that is discretionary, not mandatory, language. Lee Health does not have to repeatedly hire temporary employees to fill gaps created by a full-time employee repeatedly taking leave. *Fourth*, no policy required Lee Health to grant Dr. Walls' requests, which were unreasonable given her condition. See Sec. III.B.2.b.

### (4)  Legitimate Reasons or Pretext/Other Evidence

Even if Dr. Walls could make out a *prima facie* case, she has not overcome Lee Health's legitimate business reasons for firing her. Lee Health argues that Dr. Walls was fired legitimately, because she could not perform her job duties with or without a

reasonable accommodation, could not provide a return-to-work date, and was subject to termination for cause under the Employment Agreement's terms.  (Doc. #46, pp. 21-22.)

As noted earlier, this component of the burden-shifting analysis essentially collapses into the traditional summary judgment standard.  McCreight, 117 F.4th at 1334-37.  The Court determines whether Dr. Walls presents sufficient circumstantial evidence to raise a reasonable inference of unlawful conduct and create a triable issue on discrimination or retaliation, such as: (1) suspicious timing, ambiguous statements, or other information from which unlawful intent may be inferred; (2) systematically better treatment of similarly situated employees; and (3) other evidence that the employer's stated justifications are pretextual.  Jenkins, 26 F.4th at 1250; Berry, 84 F.4th at 1311.

An employee cannot simply "recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer"; if a proffered reason "is one that might motivate a reasonable employer . . . the employee cannot succeed by simply quarreling with the wisdom of that reason."  Chapman, 229 F.3d at 1030; see also Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999) (explaining that federal courts "are not in the business of adjudging whether employment decisions are prudent or fair").

Here, none of the evidence Dr. Walls identifies establishes

a triable issue on disability discrimination or retaliation. Therefore, the Court **GRANTS** summary judgment on Counts I and II.

**IV.**

In Count III, Dr. Walls asserts an FMLA retaliation claim against Lee Health, because it fired her on October 14, 2021, while "citing to the FMLA leave" she took "[b]etween September 2020 and October 2021." (Doc. #1, ¶¶ 48-49.) Lee Health argues that it is entitled to summary judgment because there is no causal connection between Dr. Walls' FMLA leave and her termination, and Dr. Walls cannot establish that Lee Health's reasons for firing her were pretextual. (Doc. #46, pp. 22-24.)

As noted earlier, under the FMLA, an eligible employee is entitled to take up to 12 weeks of "leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position." 29 U.S.C. § 2612(a)(1)(D). "The FMLA prohibits employers from interfering with, restraining, retaliating against, or denying 'the exercise of or the attempt to exercise' any rights guaranteed under the [FMLA]." Matamoros v. Broward Sheriff's Office, 2 F.4th 1329, 1337 (11th Cir. 2021) (quoting 29 U.S.C. § 2615(a)).

The Court employs the same McDonnell Douglas burden-shifting framework used with ADA claims. Munoz v. Selig Enters., Inc., 981 F.3d 1265, 1275-76 (11th Cir. 2020). To establish a prima facie case of FMLA retaliation, an employee must show that she (1)

"engaged in statutorily protected conduct"; (2) "suffered an adverse employment action"; and that (3) "there is a causal connection between the two." Id. at 1275. In other words, "an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." Strickland v. Water Works & Sewer Bd. of City of Birmingham, 239 F.3d 1199, 1207 (11th Cir. 2001).

If the employee makes a *prima facie* showing of FMLA retaliation, the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse action. Munoz, 981 F.3d at 1275. The burden then shifts back to the employee to produce evidence that the nondiscriminatory reason is pretextual. Id. "To show pretext, an employee must introduce evidence sufficient [for] a reasonable factfinder to conclude" that the employer's given reasons "were not the real reasons for the adverse employment decision." Id. at 1277. As with other employment discrimination or retaliation claims, an employee may make her case with sufficient circumstantial evidence.

Lee Health challenges only the third prong of the prima facie case — causal connection. Lee Health argues that there is no evidence of a causal connection between Dr. Walls' FMLA leave and the termination of her employment. (Doc. #46, p. 23.)

The proper causation standard for FMLA retaliation claims is

"but-for" causation. Lapham v. Walgreen Co., 88 F.4th 879, 893–94 (11th Cir. 2023). That standard requires a plaintiff to "demonstrate that, but for the defendant's unlawful conduct, its alleged injury would not have occurred." Comcast Corp., 589 U.S. at 331; see also Bostock v. Clayton County, 590 U.S. 644, 656 (2020).

Close temporal proximity between an employee's FMLA-protected conduct and an adverse employment action may suffice as circumstantial evidence to create a genuine issue of material fact on causation. Hurlbert, 439 F.3d at 1298. The proximity must be close, however, and a gap of three months between the protected activity and the adverse employment action is not close enough, absent other evidence. See Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006) (3 months insufficiently proximate); Jones v. Gulf Coast Health Care of Del., LLC, 854 F.3d 1261, 1271–73 (11th Cir. 2017) (3-4 months insufficiently proximate). Temporal proximity is "measured from the last day of an employee's FMLA leave." Jones, 854 F.3d at 1272.

Lee Health argues that Dr. Walls cannot rely on temporal proximity to prove causation because the period between Dr. Walls' last day of FMLA leave and her termination "was more than six months." (Doc. #46, pp. 23-24.)[9] In her response, Dr. Walls does

_____

[9] It is unclear what exact day Dr. Walls' FMLA leave expired, but undisputed that FMLA leave was no longer available to her after

not seem to disagree.  (Doc. #51, p. 24.)

When temporal proximity is insufficient to draw an inference of causation, a court must ask whether the evidence, "when viewed as a whole, 'yields the reasonable inference that the employer engaged in the alleged discrimination.'"  Holland v. Gee, 677 F.3d 1047, 1056 (11th Cir. 2012).  The Court applies the summary judgment circumstantial evidence standard discussed previously.

In Dr. Walls' single-paragraph response, she relies entirely on her Affidavit.  (Doc. #51, p. 24.)  The only evidence she proffers are comments that she attributes to other physicians, Ms. McGonegal, Dr. Garcia, and Mr. Horton.  Dr. Walls attests that "on multiple occasions," Ms. McGonegal and Dr. Garcia mentioned that "the other physicians were allegedly tired of covering my shifts because of my medical leave."  (Doc. #51-1, ¶ 31.)  Dr. Walls has not specifically tied Ms. McGonegal's and Dr. Garcia's statements to her use of FMLA — rather than non-FMLA — leave.  Additionally, the "other physicians" were not the decisionmakers in this case.  Collier v. Harland Clarke Corp., 820 F. App'x 874, 879 (11th Cir. 2020) (explaining that "remarks by non-decisionmakers and remarks unrelated to the decisionmaking process are of little probative value").

Dr. Walls also asserts that at the termination meeting, Mr.

_____

February 2021.  (Doc. #46-3, 116:1-13; Doc. #46-7, ¶ 10.)

Horton said she had "taken too much time off" and referenced the specific number of days she had taken as leave. (Doc. #51-1, ¶ 63.) But similarly neutral, "factually-based, attendance-related comments" have been found insufficient to establish "a causal link between [an employee's] FMLA leave and his termination." Chavous v. City of Saint Petersburg, No. 22-10228, 2024 WL 366243, at *3 (11th Cir. Jan. 31, 2024) (noting that comments about a plaintiff's "documented history of absenteeism" and his use of "more unscheduled leave than is acceptable" and "a lot of sick leave" were insufficient to show causation). As in Chavous, the factual accuracy of Mr. Horton's comment about Dr. Walls' leave is not disputed, and Mr. Horton's comment was neutral and non-derogatory, and not in reference to FMLA leave.

The circumstantial evidence does not establish a "causal link" between Dr. Walls' use of FMLA leave and her termination. Indeed, after Dr. Walls exhausted her FMLA leave, she was given extended non-FMLA leave by Lee Health. Lee Health's reliance on Dr. Walls' having taken "over 200 days of leave" may include the twelve weeks of FMLA leave, as Dr. Walls suggests (Doc. #51, p. 24), but that is not inherently improper.

When Dr. Walls returned in April 2021, she was given a reduced workload and continued working for several more months without incident. Dr. Walls does not argue that Lee Health's stated legitimate reasons are pretextual, and has not proffered

sufficient circumstantial evidence to defeat summary judgment.

Therefore, the Court **GRANTS** summary judgment on Count III.

**V.**

In Count IV, Dr. Walls claims that Lee Health engaged in workers' compensation interference in violation of Fla. Stat. § 440.105. Dr. Walls attests that after she returned from medical leave in April 2021, Ms. McGonegal "intimidated" her into not filing for worker's compensation. (Doc. #51-1, ¶ 44.) Dr. Walls relates that Ms. McGonegal overheard a conversation between Dr. Walls and a nurse about applying for worker's compensation for contracting COVID-19 at work. (Id. at ¶ 48.) Ms. McGonegal "laughed" and said they "were not allowed" to do so. (Id. at ¶ 49.) Ms. McGonegal then "looked directly" at Dr. Walls with a "very serious expression" and said, "You know you can't claim worker's compensation, right?" (Id. at ¶ 50.) Dr. Walls attests that if Ms. McGonegal had not "coerced" her, she would have applied for worker's compensation. (Id. at ¶ 51.)

On December 30, 2021, Dr. Walls submitted a Notice of Injury/Illness form to Lee Health, alleging that her COVID-19 disability from September 20, 2020, was work-related. (Doc. #46-4 at 29-30; Doc. #46-2 at 88-89.) Dr. Walls asserts that she waited so long to file due to Ms. McGonegal's statements. Ms. McGonegal agrees that she spoke to Dr. Walls about filing a worker's compensation claim but testifies that she merely

"explained to Dr. Walls that with the rapid spread of COVID-19, she probably would not be able to show that she contracted COVID-19 from Lee Health." (Doc. #46-7, ¶ 11.) To the extent this testimony conflicts, the Court credits Dr. Walls' version of the facts.

Dr. Walls did in fact file a claim with the Florida Division of Worker's Compensation, which was denied on the merits on January 6, 2022. (Doc. #46-2 at 90.) Among other reasons, the Division explained that Dr. Walls' condition did not "aris[e] out of and in the course of her employment" and there was "no clear and convincing evidence" that it was "caused by her employment." (Id.)

Lee Health argues that Section 440.105 does not create a private cause of action and that Ms. McGonegal's statement does not amount to fraud under the statute. (Doc. #46, pp. 24-25.) Section 440.105 simply encourages people to send tips to the Insurance Fraud Division of the Bureau of Workers' Compensation Fraud. Fla. Stat. § 440.105(a)(1). After examining the facts, the Division and may notify State agencies and the State Attorney, who may prosecute any violations. Id. Section 440.105 says nothing about a private right of action, see id., and Florida courts have held that no such right exists after the Florida Legislature "repealed section 440.37," which previously granted an "express private right of action." Montes de Oca v. Orkin Exterminating Co., 692 So. 2d 257, 260 (Fla. 3d DCA 1997).

Dr. Walls now claims that the private right of action exists in Section *440.205*, not Section 440.105.   (Doc. #51, p. 25.) Section 440.205 provides that "[n]o employer shall discharge, threaten to discharge, intimidate, or coerce any employee by reason of such employee's valid claim for compensation or attempt to claim compensation under the Workers' Compensation Law."  Fla. Stat. § 440.205.  It "creates a cause of action for employees who are subject to retaliatory treatment . . . for attempting to claim workers' compensation."  Bifulco v. Patient Bus. & Fin. Servs., Inc., 39 So. 3d 1255, 1257 (Fla. 2010); see also Francois v. JFK Med. Ctr. Ltd. P'ship, 370 So. 3d 324, 328 (Fla. 4th DCA 2023). Such claims are analyzed under McDonnell Douglas' burden-shifting framework.  Andrews v. Direct Mail Exp., Inc., 1 So. 3d 1192, 1193 (Fla. 5th DCA 2009); Chavous, 2024 WL 366243, at *4.

But Dr. Walls only pleads and alleges interference, not retaliation, (Doc. #51, p. 25–28), and she cites no Florida case law where interference has been deemed actionable under Section 440.205.  Additionally, Dr. Walls may not raise a new claim in a response to a summary judgment motion.  Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314–15 (11th Cir. 2004).

Therefore, the Court **GRANTS** summary judgment on Count IV.

Accordingly, it is now

**ORDERED**:

1. Defendant Lee Memorial Health System's Motion for Summary

Judgment (Doc. #46) is **GRANTED**.

2. The Clerk shall enter judgment in favor of Defendant Lee Memorial Health System and against Plaintiff Jennifer L. Walls, who shall take nothing.

3. The Clerk is further directed to terminate all pending motions and deadlines and to close the file.

**DONE AND ORDERED** at Fort Myers, Florida, this  21st  day of January 2025.

_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:  Parties of record